**Sol KOTZ and Kolar, Inc.,**
**Plaintiffs-Appellees,**

v.

**BACHE HALSEY STUART, INC.,**
**Defendant-Appellant.**

**No. 79–3442.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 14, 1980.

Submission Vacated March 19, 1981.

Resubmitted June 1, 1982.

Decided Sept. 3, 1982.

---

Marvin Schwartz, Sullivan & Cromwell, New York City, for defendant-appellant; Arthur P. Greenfield, Craig, Greenfield & Irwin, Phoenix, Ariz., on brief.

David Palmer, Holland & Hart, Denver, Colo. (argued), for plaintiffs-appellees; David S. Shughart, II, Phoenix, Ariz., on brief.

Mark Young, Washington, D. C., amicus curiae.

Before SKOPIL and POOLE, Circuit Judges, and HALBERT,* District Judge.

SKOPIL, Circuit Judge:

Defendant Bache Halsey Stuart Shields, Inc. ("Bache") appeals from a judgment against it for various acts of fraud and misconduct in connection with its management of plaintiff's investments in the commodities market. Bache argues on appeal that (1) the district court incorrectly instructed the jury as to the correct standard of care owed to the investor; (2) federal statutes preempt Arizona common law remedies, making an award of punitive damages improper; (3) the damage award was not supported by the evidence; and (4) alleged bias on the part of the trial judge requires a new trial.[1] We reject all of Bache's arguments and affirm.

## FACTS

Sol Kotz owned Kolar, Inc., an Arizona business engaged in aircraft scrap and sal-

---

\* The Honorable Sherrill Halbert, United States District Judge for the Eastern District of California, sitting by designation.

1. Bache also originally argued that certain 1974 amendments to the Commodity Exchange Act, 7 U.S.C. §§ 1–24 ("the Act"), did away with an

vage. In early 1976 Kotz made his first commodities investments through his account with Bache. Upon the insistence of his account executive at Bache, Stanley Katcher, Kotz' initial investments in copper futures were closed out and silver futures were purchased. Although Kotz explained to Katcher that he had no experience or background in silver futures, Katcher and Paul Singleton of Bache's New York office urged him to invest heavily in silver.

Kotz relied upon assurances from Singleton that the price of silver would climb rapidly. Katcher also told Kotz that Bache handled accounts for the Hunt family of Dallas, Texas and that they had been investing heavily in silver. (Katcher later admitted this to be a fabrication.) Katcher also told Kotz that Singleton was a "chief trader in silver" for Bache "on the floor of the exchange". (These statements were also false.) Bache was not, during this period, buying silver for its own account nor did it have information that the market would climb rapidly.

After an initial loss of about $105,000 due to a drop in silver prices, Kotz directed Katcher to enter into a "straddle" position, to cushion the effect of further losses.[2] Katcher promised to effect the "straddle" right away, but failed to do so. Meanwhile, an internal Bache report for the same day warned investors in silver to "stand aside". A later report advised against "long" positions in silver, such as that presently held by Kotz, but he was not informed about the reports.

Further declines in the price of silver resulted in further losses for Kotz, who had to borrow large sums of money to meet margin calls. During this time, Bache failed to carry out Kotz' straddle order, so as to limit his losses. After a temporary reversal of the downward trend, Katcher and Singleton persuaded Kotz to purchase additional "long" contracts.

A short time later Kotz noticed an article in the Wall Street Journal about impending legislation to release large quantities of silver bullion from the national stockpile. In fact, Bache had known of the legislation and the effect that such news would have on the silver market, but decided not to pass along the information to its clients.

In August of 1976 Bache agreed to allow Kotz to take a straddle position, but only on conditions that would have prevented recoupment of his losses. Kotz refused this offer, and even Katcher stated that it was not advantageous. On September 2, 1981 Bache finally agreed to an unconditional straddle for Kotz. By the time Kotz closed his account at Bache, a few days later, he had lost another large sum of money. All told, Kotz lost about $730,000. In order to meet margin calls during this period he had been obliged to liquidate most of the inventory in Kolar, Inc., his aircraft salvage business. Due to the haste of the sale, only a "distress sale" of the inventory was made. As a result of the sale Kotz lost substantial additional money that could have been made through operation of Kolar in the normal course of business.

Shortly after closing his accounts Kotz sued Bache in federal court on a variety of theories, including breach of fiduciary duties, actual and constructive fraud, violations of the Commodity Exchange Act, and securities violations. Some of the theories were dismissed and the case was tried to a jury. A verdict of $2.33 million dollars in actual damages, and $.35 million in punitive damages was returned. Bache's post-trial motions for judgment notwithstanding the verdict and for remittitur of the damage award were denied, and this appeal follows.

---

"implied private right of action" under the Act, as had been previously recognized in federal courts. The Supreme Court recently disposed of that argument in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, et al.,* —— U.S. ——, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). It is now clear that Kotz properly sought relief in federal court under the Act.

2. A "straddle" is a technique whereby an investor can minimize losses in an unstable market. It involves purchasing contracts to both buy and sell the given commodity in nearly the same delivery period. Thus, losses on one type of contract are somewhat offset by gains on the other.

## STANDARD OF CARE

■ Bache first argues that the court's instructions to the jury allowed a finding of liability based merely on negligence in the course of their relations with Kotz. Bache contends, relying largely on *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), that liability under the antifraud provisions of section 4b of the Commodities Exchange Act, 7 U.S.C. 6b, must be based on a showing that the defendants had knowledge or "scienter" of the falsity of their representations. Although *Ernst & Ernst* was a securities case under section 10(b)–5 of the Securities Act of 1934, it is argued to be applicable to the Commodities Exchange Act by analogy.

We find it unnecessary to decide this issue. Although portions of the district court's instructions to the jury mentioned negligence as a ground for recovery under a theory of breach of fiduciary duty under state law, the jury was also instructed that to award punitive damages intentional or reckless conduct was required.[3] The jury's award of substantial punitive damages indicated that it found Bache's conduct to be deliberate or in reckless disregard of its obligations to Kotz. Under these facts we have no difficulty in finding any scienter requirements of section 4b to be satisfied. *Cf. Nelson v. Serwold*, 576 F.2d 1332, 1336–37 (9th Cir.), *cert. denied*, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978) (reckless conduct sufficient to satisfy scienter requirement in securities context).[4]

## PREEMPTION OF STATE LAW

■ Bache also argues that the 1974 amendments to the Commodities Exchange Act preempted state law remedies that were previously recognized for fraud in the commodities area. Accordingly, Bache contends that the district court improperly allowed punitive damages to be assessed under Arizona state law.[5]

Prior to the amendments, courts had recognized that common law remedies were available to commodity customers who had suffered financial injury as a result of a breach of common law duties. *See Master Commodities, Inc. v. Texas Cattle Management Co.*, 586 F.2d 1352 (10th Cir. 1978), and *McCurnin v. Kohlmeyer & Co.*, 477 F.2d 113, 115 (5th Cir. 1973), both involving pre-1974 actions brought under the agency theory of liability.

Bache argues, however, that the 1974 amendments, creating the Commodities Futures Trading Commission as the exclusive authority for *regulating* commodities trade, also impliedly eliminated any state court remedies that previously had been recognized. The legislative history undermines this argument. Congress clearly intended to create a single agency to regulate the field: "the Commission's jurisdiction where applicable, supersedes State as well as Federal *agencies*" and "if any substantive State law *regulating* futures trading was contrary or inconsistent with Federal law, the Federal law would govern." S.Rep.No.93–1194, 93d Cong., 2d Sess. 35–36 (1974) (emphasis added.)

It does not follow, however, that creation of a central regulatory authority means abolition of common law rights, unless their retention would render the regulatory scheme ineffective. *See Nader v. Allegheny Airlines*, 426 U.S. 290, 298–300, 96 S.Ct.

**3.** The relevant portion of the district court's instructions stated: "[Punitive] damages properly are awarded where the Defendant has acted wantonly, with malicious intention, or with reckless indifference to the rights of the Plaintiffs. An act or a failure to act is wantonly done if it is done in reckless or callous disregard of, or indifference to, the rights of one or more persons, including the injured person. Punitive damages are not permitted for mere negligence alone. The negligence must include a reckless or wanton disregard for the rights of the Plaintiffs."

**4.** We note that the 1978 amendments to the Act specifically granted authority to the Commodities Futures Trading Commission to enact rules governing margin transactions in silver futures. 7 U.S.C. § 23(b). The anti-fraud rules are set out in 17 C.F.R. § 31.03. Neither the parties nor the Commission (in its *amicus* brief) addressed the impact of this legislative development, however, and we see no need to do so either, in view of the result herein.

**5.** Bache did not raise this issue below, although it did argue that the 1974 amendments elimina-

1978, 1984–85, 48 L.Ed.2d 643 (1976). Retention of common law fraud actions is in no way inconsistent with the scheme for regulation established in 1974. Indeed, the arbitration provisions of section 5a(11) of the Act, 7 U.S.C. § 7a(11), and the reparations procedures of section 14, 7 U.S.C. § 18, allow an aggrieved investor a choice of remedies in addition to those already provided by the common law. Thus, given the traditional presumption against implied repeal of common law rights and the fact that such rights are consistent with the new statutory scheme, we join the other courts that have declined to imply such a repeal. *See, e.g., Chipser v. Kohlmeyer & Co.*, 600 F.2d 1061, 1066–67 (5th Cir. 1979); *Hofmayer v. Dean Witter & Co.*, 459 F.Supp. 733, 740–41 (N.D.Cal.1978); *E. F. Hutton & Co. v. Lewis*, 410 F.Supp. 416, 419 (E.D.Mich. 1976).

### DAMAGES

Bache argues next that the size of the jury verdict was not supported by the record. Although no challenge is made to the jury instructions in this regard, it is claimed that the jury could not have awarded such damages because Kotz did not give a "firm" straddle order to Bache, and because he failed to mitigate his damages by going to another broker when he became aware of Bache's misrepresentations and refusal to effect the straddle requested.

 Our standard of review of such a claim is narrow. The excessiveness of a jury's damage award is reviewed for an abuse of the district court's discretion in denying a motion for a new trial. *Porterfield v. Burlington Northern, Inc.*, 534 F.2d 142, 146 (9th Cir. 1976). Only where the reviewing court is left with a "definite and firm conviction that a mistake has been committed" will the damage award be disturbed. *Bechtel v. Liberty National Bank*, 534 F.2d 1335, 1342 (9th Cir. 1976) (*quoting United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). We have no such conviction in this case.

ted any private right of action under federal law. The issues are intertwined and discussion

As the district court observed in denying the motion for remittitur, Kotz presented evidence to support an award of consequential damages substantially higher than that returned, based on his potential lost profits when forced to liquidate Kolar's inventory in a distress sale. While the investor is obliged to take reasonable steps to mitigate his damages once the fraud is discovered, *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 620 (9th Cir. 1981); *Foster v. Financial Technology, Inc.*, 517 F.2d 1068, 1072 (9th Cir. 1975), the jury evidently felt that Kotz acted reasonably under all of the circumstances. We have no grounds to tamper with such a determination.

### CONDUCT OF TRIAL

Bache finally argues that the trial judge demonstrated prejudicial bias and deprived it of a fair trial by questioning a witness, offering comments on the evidence, and improperly admitting certain evidence. We have reviewed the record and are unable to conclude that these alleged actions by the trial judge, either individually or taken together, represent an abuse of discretion or even an indication of bias.

AFFIRMED.

of the claim here may help to clarify the relationship of the available remedies.