**Barry N. CROOK, Plaintiff,**

v.

**SHEARSON LOEB RHOADES, INC., Defendant.**

**Civ. No. F 81–115.**

United States District Court, N.D. Indiana, Fort Wayne Division.

Dec. 16, 1983.

Charles W. McNagny, Barrett, Barrett & McNagny, Fort Wayne, Ind., for plaintiff.

Martin T. Fletcher, Rothberg, Gallmeyer, Fruechtenicht & Logan, Fort Wayne, Ind., Edward O. DeLaney, Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., for defendant.

## MEMORANDUM OPINION AND JUDGMENT

LEE, District Judge.

This matter is before the court for a decision on the merits following a bench trial. The cases alleges causes of action under 7 U.S.C. § 6b(A), I.C. 23–2–1–12, 19 and common law fraud. Shearson is counterclaiming for the debit balance in Crook's account of $4,537.50. The court, having considered the entire record and being duly advised, hereby renders and enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### Findings of Fact

Plaintiff is Barry N. Crook, a former salesperson, currently in business in Florida. Crook has a little over two years of community college which included three accounting courses. Shearson Loeb Rhoades, Inc., now known as Shearson/American Express, Inc., is the defendant. Thomas Stoody and Walter Vollmer are brokers employed by defendant, acting in furtherance of defendant's business and on its behalf. Jurisdiction in this case is based on 28 U.S.C. §§ 1331, 1332, and is conceded by the parties. This action arises out of allegations of violations of the anti-fraud provisions of the Commodity Exchange Act, 7 U.S.C. § 6b, of the Indiana Securities Act, I.C. 23–2–1–12, 19, and of common law fraud.

The following pertinent facts were stipulated by the parties. Barry N. Crook met with Thomas Stoody January 11, 1980. Crook signed a Shearson New Customer Agreement and later signed a Shearson Commodity Customer Agreement. Shear-

son does not know the exact date Crook signed the Commodity Agreement.[1] Crook told Stoody he had never traded commodity futures prior to the trades made on his behalf by defendant. Stoody never explained the definition of "liquid assets" to Crook when Stoody asked Crook to estimate same in January, 1980. Defendant's records disclose no discretionary authorization was given to Stoody to trade Crook's account. Stoody did not always contact Crook on a day a trade was made in Crook's account. Trading in commodity futures can involve substantial risk.

On July 9, 1980 a purchase was made in the account of Barry N. Crook of five September, 1980 lumber contracts at a cost of $207.00 per thousand board feet. On July 9, 1980 the account of Barry N. Crook sold short five contracts of November, 1980 lumber at $214.00 per thousand board feet. On July 21, 1980 a purchase was made in the account of Barry N. Crook of five November, 1980 lumber contracts at a cost of $216.00 per thousand board feet. On July 29, 1980 the account of Barry N. Crook sold short five contracts of September, 1980 lumber at $215.10 per thousand board feet.

On August 11, 1980 the account of Barry N. Crook sold short five contracts of November, 1980 lumber at $204.00 per thousand board feet. On August 12, 1980 a purchase was made in the account of Barry N. Crook of five March, 1981 lumber contracts at a cost of $212.30 per thousand board feet. On August 19, 1980 a purchase was made in the account of Barry N. Crook of five November, 1980 lumber contracts at a cost of $203.10 per thousand board feet. On August 28, 1980 the account of Barry N. Crook sold short five contracts of January lumber at $177.40 per thousand board feet.

On September 10, 1980 the account of Barry N. Crook sold short five contracts of March, 1981 lumber at $185.60 per thousand board feet. Barry N. Crook received confirmations and client commodity account statements detailing each purchase or sale of any commodity made in his account.

Other facts established at trial are as follows. On January 11, 1980 Crook opened a Shearson Daily Dividend Income Account ("SDDI") with a $10,000.00 deposit. The SDDI account was a money market fund with no risk involved and no commissions involved with the administration of the SDDI. Crook indicated his objective was appreciation/risk; speculation was not an objective. While there is some dispute as to whether commodities were discussed at the January meeting, there is no dispute commodities were discussed at a May conversation between Crook and Stoody.

Crook asked about "quick money" and about commodities. Stoody informed Crook that he could gain or lose a lot of money trading commodities. Crook declined to invest in commodities because he felt it was too risky.

While there is a dispute as to whether Stoody explained "margin" to Crook, there is no doubt that, even if explained, Crook did not understand the concept of "margin" and the great significance margin bears in relation to trading in commodities. There is no evidence Stoody took steps to ascertain if Crook really understood margin and the risks inherent to the market or merely heard the words alone. There was no discussion at the May conversation about either trading limits placed on the markets by the exchanges or stop-loss orders placed on individual trades by the commodities brokers.

Stoody informed Crook a Commodity Customer Agreement had to be signed before Stoody could commence entering commodity trades in Crook's account. A Risk Disclosure Statement, required by Federal Regulations, is uniformly attached to the Agreement.

The Commodity Agreement was returned to Stoody on July 8, 1980. The Agreement was not dated. It was received in the New

---

1. There is a dispute as to whether Crook received the Risk Disclosure Statement which is uniformly attached to the Shearson Commodity Agreement.

York office August 8, 1980. A Risk Disclosure Statement was stapled on the Agreement, laid over the last page. Mr. Crook did sign the portion of the Agreement stating he received and understood the Risk Disclosure Statement. However, Crook testified he never received any Risk Statement. The court finds Crook did not receive the Risk Disclosure Statement.

It is reasonable that Crook signed the Commodity Agreement portion relating to the Risk Disclosure Statement because that portion also is the portion relating to the required attestation the Customer Agreement is understood by the customer. It is further reasonable Crook could have thought he had received the Risk Disclosure Statement because the Customer Agreement discloses some risks involved in commodity trading in paragraph fourteen. Finally, even if the court were to conclude Crook received the separate Risk Disclosure Statement, he could not have had the true risks involved disclosed to him through the Statement, because he never had "margin" fully explained to him and never had "stop-loss" or "stop-limit" orders or "leverage" explained to him at any time.

On June 4, 1980 Stoody entered an order for Crook for one commodity futures contract of pork bellies. That order was not filled because the prices never came down to the order price. The order was re-entered, but the re-entered order also was not filled. All of this occurred in violation of specific written Shearson policy that no trades are to be transacted before the customer signs and returns a completed Commodity Customer Agreement. Further, the order shows the manager Vollmer never initialed this first order in Crook's new commodity account as required by Shearson policy.

Vollmer also never checked, as required by Shearson policy, Crook's financial references and information and his investment objectives as they related to and were re-stricted by his financial condition in January or in July of 1980. Stoody testified he did not check references, but did check Crook's investment objectives vis-a-vis his financial condition. Although Stoody and Shearson said they had no knowledge of any change in Crook's financial status, the two agreements, one a New Account Agreement received in January, 1980 [2] and one a Commodity Customer Agreement received in July, 1980, reflect there were changes, at least insofar as indicated by a change in occupation and title. An occupational change could signal a change in the financial condition of a customer about which a broker should inquire.

In late June or early July another conversation occurred between Crook and Stoody with the topic again being commodities. Stoody informed Crook trading commodities on a spread, i.e., offsetting sales and purchases of an equal number of commodity futures contracts, is a less risky way of trading commodities. Stoody did not explain what an outright position and its risk was, i.e., having only one side or the other, nor did he explain stop-loss orders. He did, however, explain trading limits, representing that a five point shift either way was the maximum the markets could move before trading would be cut off by the exchanges. Stoody also explained how to get out of a spread position. Stoody omitted telling Crook there was a significant risk increase if one leg of the spread came up and Crook was left in an outright position. He did not tell Crook margin requirements virtually double when one moves from a spread position to an outright position in commodity futures contracts trading.

Crook asked what Stoody recommended and the amount needed. Stoody recommended five contracts on each side of the spread. Stoody told Crook he needed $3,500.00 to enter into the trades. Crook gave his authorization to Stoody to enter the discussed trades.

2. Plaintiff's Exhibit 13 is the new Account Agreement. There was testimony regarding the contents of both pages of the Agreement and the entire Agreement was admitted without objection. However, only the first page of the Agreement was given to the court as Exhibit 13. The court relies on the actual testimony as an accurate statement of the second page.

At no time was there any indication Crook understood the real significance of the course of action being taken. Stoody showed Crook various graphs and statistics about the commodity market and, in particular, lumber contracts. By Stoody's own admission, Crook did not "take" to the information "with a great deal of expediency." Further, Stoody admitted that Crook ignored the information and that Crook did not realize the extreme relevance of the information, particularly as it related to and explained the concept of margin requirements.

Another broker, Robert L. Garman, testified that he informs his commodity clients about stop-loss orders and their function of limiting loss. Garman opined that, based on an assumption the size of a proposed commodity account is $10,000 to $12,000, it would be inappropriate to place such an account in an outright position in five commodity contracts. Further, Garman testified it is the normal business practice to close out both sides of a spread position at the same time. Stoody testified ninety-five per cent of all investors should not trade commodities. He also testified commodity trading requires ample capital, time, and most important, understanding. Finally, Stoody stated if a customer cannot understand, then it is inappropriate to enter commodity trades on the customer's behalf. Crook did not understand. Stoody went ahead with the trades.

On July 21, 1980 Stoody took off one leg of the July 9, 1980 spread without Crook's authorization. He then called Crook and informed him there had been a loss of $1,357.50 on the trade. Stoody recommended remaining in the outright position on the remaining leg of the spread because Stoody thought the market would go higher. It was at this time that Stoody first informed Crook that by lifting off one side of the spread the risk increases, the margin changes, and more money is needed.

Stoody told Crook the additional money would have to come out of his SDDI account. The money was transferred. While Stoody told these facts to Crook, there is no evidence he explained their significance to Crook or attempted to ascertain if Crook understood why the risk increased in an outright position, why he had to put up more money, or why the additional money constituted meeting a margin call.

On July 29, 1980, on his own initiative, Stoody removed the remaining leg of the spread. A profit occurred of $3,692.50. Stoody informed Crook of the result. Crook was pleased "he had got a profit in his first trade." [3] Crook asked Stoody for more recommendations. Stoody had none at that time, but promised to get in touch when he did.

Stoody contacted Crook in early August about entering an outright position of five November lumber contracts. They discussed strategy and the money needed for the trade ($6,000.00 margin requirement). Stoody told Crook Stoody would take protective steps to stop loss either by liquidating the proposed November lumber trade or by locking off Crook's position by entering into an offsetting position. Crook okayed the trade which was done August 11, 1980.

Stoody did not tell Crook about stop-loss orders nor that an "outside day" had occurred in the lumber market nor that the "locking off" would cause Crook again to be in a spread position in the commodities market nor that the outright position was riskier than a spread. Stoody told Crook about the market moves at that time, but did not use the term "outside day." Stoody did not explain the significance of the market moves; he merely told Crook what had happened.

Stoody called Crook after the August 11, 1980 transaction and suggested Crook lock off his position by buying five March lum-

**3.** In fact, Crook's actual first closed trade resulted in a loss. The end result on July 29, 1980 was that enough profit occurred in the closing of the remaining position to cover the July 21, 1980 loss and give Crook a profit. It is clear Crook thought of the July 29 closing as the finishing of one transaction, *i.e.,* the less risky spread begun July 9, 1980 and not as the closing of an outright position which carried far more risk than a spread position.

ber contracts. Crook asked for Stoody's recommendation. Stoody informed Crook he was in the same position and he was going to follow his own strategy and lock off his position. Crook agreed to follow Stoody's suggestion and lock off by buying five March lumber contracts. Those contracts were brought August 12, 1980 with a fill limit placed on the order. Stoody did not inform Crook of the manner in which Stoody placed the lock off order or its significance.

On August 11, 1980 Stoody discussed the general strategy for getting out of the straddle position. He did not tell Crook a straddle and spread described the same position. Stoody closed out one side of the straddle (the November contracts) on August 19, 1980. The close resulted in a profit of $92.50. Stoody called Crook on August 20, 1980 to inform him of the August 19, 1980 transaction.

Also on the twentieth, Stoody informed Crook more money was needed for margin requirements because one side of the spread was lifted. In addition, Stoody told Crook more money was needed for maintenance margin because the price of lumber had dropped. Crook asked Stoody the purpose of all the money. Although Stoody thought Crook was pretending he did not know what the money (approximately $4,200) was for, Stoody explained that the margin requirements had increased because the market "had gone against us" and margin increases whenever one only has one side of a spread remaining, i.e., an outright or naked position.

Stoody told Crook on the twentieth his options were either to meet the margin call, thus, staying in the market with an unrealized loss or to liquidate his remaining position, thus, getting out of the market with a realized loss. Crook asked how long he had to come up with the money to allow Crook to stay in the market. Stoody gave him until noon on August 25, 1980.

Crook did not contact Stoody by noon on August 25. Stoody was on vacation, but called into the Shearson office to check. When advised by the cashier Crooks' mar-

gin call was $3,000.00, Stoody instructed the cashier to transfer that amount from Crook's SDDI account to cover the call. Crook did not authorize such a transfer.

Stoody spoke with Crook on August 26, 1980. Crook said he was trying to borrow money to meet the call, using his real estate as collateral. Crook said he would bring the money in on August 27, 1980. Crook did not bring in the money.

On August 28, 1980 Stoody contacted Crook. Crook informed him the bank would not loan him money, but Crook was trying to get the money from other sources and thought he could get the money. Stoody then told Crook the margin was now $9,500.00. Stoody asked Crook to get back to him by noon on the 28th. Crook was trying to get the needed money prior to the market closing on August 28.

Crook did not call by noon and when Stoody attempted to reach him, Crook's telephone line was busy. The commodity markets close at one o'clock. Because Stoody felt Crook was attempting to get the money, and, indeed, the evidence is that he was trying, Stoody went in to the lumber market and locked off Crook's outright position by selling five January lumber contracts. That is precisely what Stoody did in his own account. He did so in both accounts in order to lower margin requirements by putting a spread position back on. Crook did not authorize the trade.

Later in the afternoon of the 28th, around 4:00 p.m., Stoody reached Crook. Crook told Stoody he was going to Indianapolis on the 29th to get the money he needed. Crook was not telling the truth. Stoody told Crook to bring to Stoody a check for $9,500.00, dated the 29th, and call Stoody when Crook deposited the actual funds in his checking account and then Stoody would deposit Crook's check. Stoody also told Crook he thought the market would rally. Crook agreed to the plan, but did not follow it.

Crook brought Shearson a check August 29, 1980 which he gave to a Shearson cashier, not Stoody. The cashier asked Crook if

the check was good because it was an uncertified check. Crook answered the check was good. The cashier deposited the $9,500.00 check. The check bounced. Crook knew the check was bad. After the market closed on the 28th, Crook was no longer trying to get money, he was trying to put Shearson off.

On September 3, 1980, Stoody informed Crook the check had bounced and Crook had forty-eight hours to make it good. Crook told Stoody he could get the money by September 8. Again, Crook was putting Shearson off, hoping the market would rally. It was at this time, after the close of the market on August 28, 1980, that Crook began watching the lumber market and became involved in the markets and his accounts. Up until this time, Crook had been trusting Stoody and Stoody's recommendations. Crook thought the commodity futures market and the contracts were just like the stock market and stocks in that one could lose money, but only what one actually invested. Crook felt Stoody was in control of Crook's commodity account. After 1:00 p.m. on August 28, 1980 it is clear Crook was not trying to get money and was hoping Shearson would carry him and the market would rally and Crook would not need to get any money.

No money came in to the Shearson office on September 8, 1980. On September 9, 1980, Stoody and Shearson received a letter from Crook stating he did not understand the events occurring in his commodities account. Shearson liquidated Crook's account at a loss by closing out the spread on September 10, 1980. After deducting the money still in Crooks' SDDI account, as provided for in the Agreements Crook signed, there was a debit balance remaining of $4,537.50. Shearson has counterclaimed for that debit amount.

In all, then, five complete trades were made in Crook's commodity account. All of the trades consisted of five lumber futures contracts. The first trade of November 1980 lumber resulted in a loss of $1,357.50. The second trade of September 1980 lumber resulted in a profit of $3,692.50. The third trade again of November 1980 lumber resulted in a profit of $92.50. The fourth trade of January 1981 lumber resulted in a loss of $5,687.50. The fifth and final trade of March 1981 lumber resulted in a loss of $11,277.50.

## Conclusions of Law

### I

The complaint rests on three theories: section 6b(A) of the Commodity Exchange Act, sections 23–2–1–12, 19 of the Indiana Securities Act, and common law fraud. Each will be addressed in turn.

### A

Section 6b(A) states,

It shall be unlawful ... to cheat or defraud or attempt to cheat or defraud such other person.

7 U.S.C. § 6b(A). To prevail, Crook must show, by a preponderance of the evidence, that Shearson has defrauded him under section 6b(A).

A private right of action exists under section 6b of the Commodity Exchange Act. *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). Section 6b's language is similar to the language of section 10(b), the antifraud provision of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). *Id.* at n. 88. Under 10(b) and Rule 10b–5, liability must be based on more than negligence, some sort of scienter is required. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Liability based upon recklessness has been found under the Commodity Exchange Act for fraud in the sale of foreign futures contracts. *First Commodity Corp. v. Commodity Futures Trading Commission*, 676 F.2d 1 (1st Cir.1982).

The Commodity Futures Trading Commission has decided that negligence can support liability under section 6b(A). *Gordon v. Shearson Hayden Stone, Inc.*, Comm.Fut.L.Rep. (CCH) ¶ 21,016 (Comm. Fut.Trading Comm., April 10, 1980). That decision has not been picked up and

adopted by the courts. *See First Commodity,* 676 F.2d at 4. *Cf. CFTC v. Savage,* 611 F.2d 270, 283 (9th Cir.1979). The Ninth Circuit apparently views the standard of scienter necessary for a violation of section 6b(A) as an open question. *Kotz v. Bache Halsey Stuart, Inc.,* 685 F.2d 1204, 1207 (9th Cir.1982). Recognizing the deference due to the Commission and recognizing the apparent choice by the courts not to rely upon the Commission's decision in *Gordon,* this court will follow the *Kotz* court's approach. The *Kotz* court declined to resolve the issue of the appropriate standard of liability because the evidence there showed more than mere negligence and thus, it was not necessary for the *Kotz* court to decide the issue. The evidence here shows more than mere negligence, it shows recklessness. Recklessness supports a conclusion section 6b(A) has been violated. Thus, this court need not decide the issue of whether negligence suffices to support a violation of section 6b(A).

Recklessness has been defined by the Seventh Circuit as "a lesser form of intent." *Sanders v. John Nuveen & Co., Inc.,* 554 F.2d 790, 793 (7th Cir.1977).

> Under this definition [of recklessness] the danger of misleading buyers must be actually known or so obvious that any reasonable man would be legally bound as knowing, and the omission must derive from something more egregious than even "white heart/empty head" good faith. While this definition might not be the conceptual equivalent of intent as a matter of general philosophy, it does serve as a proper legally functional equivalent for intent, because it measures conduct against an external standard which, under the circumstances of a given case, results in the conclusion that the reckless man should bear the risk of his omission.

*Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1045 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977) (footnotes omitted). *See also First Commodity,* 676 F.2d at 6–7.

The facts disclose several conclusions. Stoody, an employee of Shearson, knew Crook was an unsophisticated investor. Crook had only a few years of community college courses, he had not owned stock except for some cable television stock, he had never traded commodities, and he knew nothing about the commodities market. Crook told Stoody he thought commodities were too risky. Stoody talked to Crook about commodities and realized Crook did not understand the statistics or the relevance of crucial terms in commodity trading. Crook asked Stoody for recommendations, an indication he could not trade or pick trades without assistance from someone Crook considered knowledgeable in how trading and the commodities market worked. Yet, with all of these facts known to Stoody, Stoody went ahead, in *de facto* discretionary control of Crook's account, into the market and traded. Stoody had a fiduciary duty to Crook and Crook's account. Stoody made the identical trades in his own personal account he made in Crook's account.

Such conduct on the part of a fiduciary, an experienced broker and a knowledgeable commodities investor was reckless and in violation of section 6b(A). Stoody's only excuse is that he thought Crook "took" to the basic strategy. Of course, Crook took to the basic idea a large amount of money could be made in a short period of time because he did not understand the risks increased correspondingly. Stoody allayed Crook's worries by the explanations he gave Crook. However, Stoody never explained stop loss orders, outside days, or outright positions. Crook may have heard the words which were spoken, but he did not, indeed, could not, have understood their import. Hearing is not necessarily understanding.

Finally, there is the last conclusion the facts disclose which points to Shearson's recklessness. Stoody testified no one should trade commodities unless they had ample time, ample money, and ample understanding of the commodities markets and its vagaries. Crook possessed none of the above. Crook only began to be aware

of and understand what was happening with his account and the market after August 28, 1980. It is undisputable Stoody omitted making the essential determination Crook truly understood the facts. Stoody recklessly misled Crook on the realities of the commodities markets. Such conduct violates section 6b(A). *Cf. Gordon.*

## B

I.C. 23–2–1–12 states,

It is unlawful for any person in connection with the offer, sale or purchase of any security, either directly or indirectly, (1) to employ any device, scheme or artifice to defraud, or (2) to make any untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of circumstances under which they are made, not misleading, or (3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

(Burns Code Ed., 1971). I.C. 23–2–1–19 provides for the recovery of damages if a violation is proven.

■■■ Shearson violated I.C. 23–2–1–12. The standard of liability necessary to prove a violation of I.C. 23–2–1–12 is negligence. *Rousseff v. Dean Witter & Co., Inc.,* 453 F.Supp. 774, 779 (N.D.Ind.1978). Crook had no affirmative duty to discover that he did not actually understand what had been explained to him about commodities or that there was more to the commodities area which had not been explained. *Kelsey v. Nagy,* 410 N.E.2d 1333 (Ind.App.1980).

■■■ Negligence has been shown as well as recklessness. The discussion of the facts supporting this court's conclusion that a federal commodities law violation occurred due to Shearson's recklessness supports the court's conclusion that an Indiana securities law violation occurred. That discussion of the omissions of determining Crook's actual understanding and of material definitions from Stoody's explanation and the accompanying conclusions is hereby incorporated by reference into the discussion and conclusion here that I.C. 23–2–1–12 has been violated.

The true bottom line in this case is that Crook should never have been in the commodity markets, no matter how great his desire to make "quick money" or Stoody's belief Crook "took" to the basic strategy. One can understand "quick money" can be made, but not understand how or why that money will be quickly made (or quickly lost), based on representations from one acting in a fiduciary capacity to the interested party. Stoody had an obligation to stop Crook before he began because Crook was not capable of understanding any more than a simplistic view of the course which he thought he wanted to take. Stoody acted recklessly, in violation of Indiana and federal laws, in concluding that because Crook appeared to take to Stoody's basic strategy and desired to make "quick money" in commodities, it was appropriate and responsible to open and trade a commodity account for Crook.[4]

## C

The last theory upon which Crook predicates Shearson's liability is common law fraud.

To sustain an action for fraud it must be proven by a preponderance of the evidence that a material representation of a past or existing fact was made which was untrue and known to be untrue by the party making it, or else recklessly made, and that another party did in fact

---

**4.** The question also presents itself as to why Stoody recommended five contracts in a small account instead of only one contract. It seems that if Stoody felt Crook took to the basic strategy and not to the statistics, graphs and definitions involved, and yet might be an appropriate commodities investor, one contract (a spread position of one contract on each side) would be the appropriate size for a trade. Stoody could then have assessed, by asking Crook to explain the dynamics of the situation, if Crook, an unsophisticated investor, had minimally sufficient qualifications to trade commodities. The court still holds the conclusion Crook should not have been allowed to open and trade a commodity account, based on what was known to his broker.

rely on the representation and was induced thereby to act to his detriment. *Peoples Trust Bank v. Braun*, 443 N.E.2d 875, 877 (Ind.App.1983) *quoting Plymale v. Upright*, 419 N.E.2d 756, 760 (Ind.App. 1981) (citations omitted).

■ Constructive, actionable fraud can arise from a breach of duty by the dominant party in a fiduciary relationship. *Hall-Hottel Co. v. Oxford Square Co-op, Inc.*, 446 N.E.2d 25, 31 (Ind.App.1983). "[F]ailure to disclose all material facts by one on whom the law imposes a duty to disclose constitutes actionable fraud." *Fleetwood Corp. v. Mirich*, 404 N.E.2d 38, 41 (Ind.App.1980).

■ This court concludes actionable fraud exists. The facts disclose Shearson and Crook were in a fiduciary relationship. Shearson was the dominant party in the fiduciary relationship. A broker-customer relationship is a fiduciary one. *Gordon*, ¶ 21,106 at 23,981. Further, Stoody exercised *de facto* discretionary control over the account and consequently, had an even stronger fiduciary responsibility toward Crook and his account. *Henricksen v. Henricksen*, 640 F.2d 880, 886 (7th Cir. 1981).

Crook made no independent suggestions or recommendations in or for his account. He was not always notified prior to trades in his account or immediately thereafter. He had no meaningful input into the actions taken in his account. He could not determine his own best interests or evaluate Stoody's recommendations. *See Mihara v. Dean Witter & Co., Inc.*, 619 F.2d 814 (9th Cir.1980); *Kaufman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 464 F.Supp. 528 (D.Md.1978); *Kravitz v. Pressman, Frohlich & Frost, Inc.*, 447 F.Supp. 203 (D.Mass.1978). Stoody failed to disclose all material facts and failed to explain adequately the material facts he did disclose.

## II

■ Having concluded plaintiff has proven his case by a preponderance of the evidence, this court must address Shearson's defense of Crook's own contribution to the events and Shearson's counterclaim. Although this court concludes Crook was harmed, the court also concludes Shearson was harmed by Crook. Crook admitted he became actively involved after August 28, 1980. It is clear from the evidence Crook was not attempting, in good faith, to obtain the funds to meet his margin call. He kept putting Stoody off, kept telling Stoody the money was on its way. It clearly was not. Crook's conduct after August 28, 1980 bars his full recovery for all losses suffered. Shearson is entitled to recover on its counterclaim. It is important to state that the court is assessing liability against Shearson, not because it did anything wrong per se in the actual trading of the account, but because Shearson failed to follow its own policies designed to insure against unsophisticated and nonunderstanding investors getting into the commodities market and because Stoody should never have allowed Crook to trade commodities with the level of understanding and income Crook possessed. Once Crook began attempting to use Shearson, hoping the market would rally, thereby cutting or recouping Crook's losses, Shearson's liability ceases and Crook's begins.

## III

■ Turning now to the issue of damages, the court addresses Crook's request for punitive damages in addition to the actual damages awarded. The awarding of punitive damages is a substantive issue and therefore controlled by Indiana law. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In Indiana, punitive damages can be awarded only upon proof of same by clear and convincing evidence. *The Travelers Indemnity Co. v. Armstrong*, 442 N.E.2d 349, 362 (Ind.1982).

■ Punitive damages are not awarded as compensation to a party; they are awarded to punish a wrongdoer and to deter future misconduct. *Farm Bureau Mutual Insurance Co. v. Dercach*, 450 N.E.2d 537, 541 (Ind.App.1983). That a

party has proven a compensable injury does not mean the party is entitled to punitive damages. *Travelers*, 442 N.E.2d at 362; *Farm Bureau*, 450 N.E.2d at 541. If a court finds punitive damages appropriate, then the law permits an awarding of such damages. *Farm Bureau*, 450 N.E.2d at 541.

 Punitive damages are inappropriate here. Shearson acted recklessly, but not knowingly or deliberately. Shearson does not need to be punished further than to pay compensation to Crook. Further, Shearson does not need to be punished in a situation where Crook eventually began deceiving Shearson. Awarding punitive damages will not serve to deter future misconduct in any better way than the compensatory damages award can. The procedures and policies necessary to stop the kind of injury which occurred here are already in place. They merely need to be followed and enforced. Clear and convincing evidence does not exist in this case to support a punitive damages award.

The compensatory award is computable, based on the court's findings and conclusions, as follows. The court believes the appropriate cut-off date for Crook's award is August 28, 1980. Prior to the market closing on that date, Shearson still believed Crook was attempting to raise money and entered a trade on his behalf to lower the margin requirements in his account. Crook was still trying. It was after the market closed on the 28th that Crook began to try to put off Shearson and clearly began to follow the market and his positions, and purposely extended the life of the account until September 10, 1980.

Both parties must bear the consequences of their conduct. Crook is entitled to recover his initial SDDI investment of $10,000.00 plus interest as would be due him if $10,000.00 had been drawing interest in his SDDI account from January 11, 1980, the day he opened the account, until August 28, 1980. From that amount there must be a deduction of Shearson's counter-claim of $4,537.50. That net amount shall bear prejudgment interest from the date it fully accrued (September 10, 1980) until the date of entry of this judgment. The rate of interest shall be calculated and computed in accordance with the provisions of 28 U.S.C. § 1961 as presently enacted. The legal interest rate is 9.93%.

This case concerned, in part, the resolution of a federal question. Section 1961 does not bar prejudgment interest simply because it is silent on the question. *Bricklayers' Pension Trust Fund v. Taiariol*, 671 F.2d 988 (6th Cir.1982) and cases cited therein. *See Rodgers v. United States*, 332 U.S. 371, 68 S.Ct. 5, 92 L.Ed. 3 (1947).

 The awarding of prejudgment interest is within the discretion of the court and is based on traditional equitable principles. *Bricklayers; American Timber & Trading Co. v. First National Bank of Oregon*, 690 F.2d 781 (9th Cir.1982). The underlying purpose of awarding interest on compensatory damages is to make the wronged party whole by compensating the wronged person for being deprived of the monetary loss, *i.e.*, the money and the use of the money. *Turner v. Japan Lines, Ltd.*, 702 F.2d 752 (9th Cir.1983); *American Timber; United States v. California State Bd. of Equalization*, 650 F.2d 1127 (9th Cir.1981), *aff'd mem.* 456 U.S. 985, 102 S.Ct. 2261, 72 L.Ed.2d 864 (1982).

 Mr. Crook has been deprived of an ascertainable amount of money damages and its use and he is entitled to recover not only the actual amount, but also the interest being earned from the use of the money. *See Argonaut Insurance Co. v. Town of Cloverdale, Indiana*, 699 F.2d 417, 421 (7th Cir.1983). Finally, prejudgment interest serves to further the purposes underlying the antifraud provisions of the security laws. Prejudgment interest is appropriate when it furthers the purposes of the statute in question. *Rodgers*, 332 U.S. at 373, 68 S.Ct. at 6; *Bricklayers*, 671 F.2d at 989.

The court cannot fix the precise recovery at this time because it does not have before it the interest rate or rates which would have been applicable to the SDDI account from January 11, 1980 to August 28, 1980.

It is expected that the parties should be able to stipulate to the appropriate rate or rates, and the court expects that they can file an appropriate stipulation so that damages may be assessed. If, however, the parties are unable to reach an accord on the applicable rate or rates, the court will set the matter for a hearing. Within twenty (20) days from the date of this order, the parties are to submit any stipulation they can reach regarding the applicable rate or rates and the computation of the interest which would have accrued on the SDDI account from January 11, 1980 to August 28, 1980.

### IV

■ Crook seeks an award of attorney's fees if successful. Crook successfully proved a violation of law and his attorney is entitled to an award of reasonable fees. The court also finds costs should be borne by the defendant. Plaintiff is directed to file a verified breakdown and explanation of charges and time requested and any other supporting materials as plaintiff wishes. *Cf. Waters v. Wisconsin Steel Works,* 502 F.2d 1309 (7th Cir.1974), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976) (award of fees pursuant to 42 U.S.C. § 1988); *Code of Professional Responsibility* DR 2–106. The amount of the award will be set by further order of this court. A copy of plaintiff's showing relating to attorney's fees shall be served on defendant, and defendant shall have ten (10) days from the date of filing to respond or otherwise challenge the showings and facts set forth.

### V

■ Also pending before this court is plaintiff's motion for deposition expenses and attorney's fees. Plaintiff seeks $517.00 in deposition expenses and $250.00 in attorney's fees for a deposition which was supposed to occur December 23, 1981. The deposition had to be cancelled due to icy roads and general inclement weather conditions in the State of Indiana on December 23, 1981. It is reasonable to cancel a deposition when weather conditions make an appearance by counsel unsafe or virtually impossible. Plaintiff's motion is DENIED.

### Conclusion

Plaintiff has established by a preponderance of the evidence that the actions of defendant violated federal commodities law, state securities law and common law. Defendant has proven its right to recover on its counterclaim. Accordingly, plaintiff is entitled to recover damages, costs, and attorney's fees to be awarded by further order of this court.

This memorandum of decision contains the court's findings of facts and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. *See Rucker v. Higher Educational Aids Board,* 669 F.2d 1179, 1183–84 (7th Cir. 1982).