953 F.2d 1387
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Lucille A. MCKENZIE; Cecil Mckenzie, Jr., Plaintiffs-Appellees,
v.
THE CITY OF MILPITAS; Frank Acosta, individually and in his
capacity of the City of Milpitas, Defendants-Appellants.
 No. 90-16166.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Dec. 12, 1991.
Decided Feb. 7, 1992.
 
 Before GOODWIN, SKOPIL and NOONAN, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 In 1988, police officers from the City of Milpitas ("Milpitas") used taser weapons to subdue Lucille and Cecil McKenzie (the "McKenzies") at the McKenzie home. The McKenzies sued Milpitas under 42 U.S.C. § 1983 (1988) for damages for unconstitutionally excessive force used against them. Milpitas appeals the judgment on a jury verdict in favor of the McKenzies. We affirm.
 
 
 3
 In 1985, the Milpitas police force introduced the taser gun to its arsenal of weapons. The taser, which looks like a flashlight, is a device which fires two darts attached by wires. When the darts are stuck into a subject and a button is depressed on the taser, the darts transmit a 50,000 volt charge of a low amperage. This charge immobilizes most of the muscles of the subject usually causing her to collapse to the ground.
 
 
 4
 In introducing the taser, Milpitas included a written policy on the proper use of the weapon. This policy was adopted, with a number of modifications, from the taser policy of the city of Los Angeles. In addition to its written policy, the Milpitas police force conducted a training procedure on the proper use of the taser. Officers were required to complete the training before being issued a taser.
 
 
 5
 On March 19, 1988, Milpitas police officers received a report of a family dispute at the home of Lucille McKenzie. By the time the first officer, Officer Pangelinan, had arrived, the dispute had dissipated. Officer Pangelinan approached Lucille on the street and asked what had happened. Lucille refused to give the officer any information, and the officer called for backup. Within minutes, the area in front of the McKenzie home was filled with Milpitas police officers. Officer Comfort stood on the McKenzie front lawn and covered the porch with his taser. Lucille stood on the sidewalk in front of her home with her sister-in-law and Officer Ferguson. At this point, Cecil McKenzie Jr. ran from the porch toward his mother and Officer Ferguson. Officer Comfort ordered Cecil to halt. Cecil continued, and as he was in mid-air after jumping the three foot fence which separated the McKenzie front lawn from the sidewalk, Officer Comfort tasered him in the back. Cecil crumpled in mid-air and collapsed to the sidewalk. Officer Ferguson immediately moved to handcuff Cecil. Viewing this, Lucille cried out that the officers had "shot my baby" and ran toward the fallen Cecil and Officer Ferguson. Officer Pangelinan ordered Lucille to halt and when she continued the officer shot her twice in the back with the taser. Still conscious, Lucille attempted to crawl toward Cecil but was restrained by the officers on the scene.
 
 
 6
 The McKenzies subsequently brought this action against Milpitas under 42 U.S.C. § 1983. The jury awarded Lucille $200,000, and Cecil $10,000. Milpitas is challenging the rulings on various motions as well as the legal and evidentiary grounds for imposing § 1983 liability on it. In addition, Milpitas argues for the first time that the trial judge was prejudiced against the city.
 
 I. Section 1983 Municipal Liability
 
 7
 To establish municipal liability under 42 U.S.C. § 1983, plaintiffs must establish: (1) a violation of their constitutional rights; (2) the existence of a municipal policy or custom; and (3) a causal nexus between the policy or custom and the constitutional violation. Monell v. Department of Social Serv., 436 U.S. 658 (1978); City of Canton, Ohio v. Harris, 489 U.S. 378, 387-88 (1989).
 
 
 8
 A. The Constitutional Violation: Excessive Force
 
 
 9
 In order to succeed on their claim against Milpitas, the McKenzies were required to show that the tasering amounted to an unreasonable seizure. Such a showing involves the "careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Graham v. Connor, 490 U.S. 386, 396 (1989) (quoting United States v. Place, 462 U.S. 696, 703 (1983)). In excessive force cases, governmental interests include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id.
 
 
 10
 Milpitas argues that the tasering of the McKenzies was constitutional as a matter of law because the McKenzies suffered no long-term harm. Even assuming this factual assertion is correct, Milpitas' argument must fail. In making this argument, Milpitas relies on Michenfelder v. Sumner, 860 F.2d 328 (9th Cir.1988). Michenfelder is inapposite to this case. Michenfelder concerned the eighth amendment claim of a prisoner. This case involves a fourth amendment claim by members the general public. Each claim has its own test and its own underlying rationale. The test for a fourth amendment violation does not require long-term harm or serious physical injury.
 
 
 11
 In addition to its legal argument, Milpitas challenges the evidentiary sufficiency of the jury's unreasonable seizure finding. Milpitas does not contest that tasering a subject effects a constitutional seizure. The issue in this case was whether the tasering was reasonable under the circumstances. Here, that analysis focussed on the safety of the officers and the nature of the intrusion caused by the taser.
 
 
 12
 Regarding the threat posed by the McKenzies to the safety of the officers, each side presented diametrically opposed stories. The court specifically instructed the jury to consider whether the McKenzies had posed such a threat, and even cautioned the jury against second-guessing the officers who may have had insufficient time to think. That the jury found for the McKenzies indicates that they believed the McKenzies' version of the tasering incident. There was evidence to support the verdict.
 
 B. City Policy
 
 13
 Section 1983 jurisprudence provides three distinct methods or bases for establishing a city "policy or custom": (1) city regulations, Monell, 436 U.S. at 690; (2) "failure to train," City of Canton, 489 U.S. at 387-88; and (3) city customs, Monell, 436 U.S. at 690-691. In this case, the McKenzies relied on the first two. They argued that Milpitas' written taser regulation--which Milpitas concedes represents city policy--caused the alleged use of excessive force against them. In the alternative, the McKenzies argued that Milpitas' alleged failure to adequately train its officers in the use of the taser caused this force.
 
 1. The City Regulation
 
 14
 Milpitas argues that the McKenzie's "policy" theory must fail as a matter of law because Milpitas' written taser policy restates constitutional law regarding the use of force by police officers. The taser policy provides that "[t]he Taser may be used [w]hen ... [a]ttempts to subdue the suspect by ... verbalization ... have been, or will likely be ineffective." This authorization is limited only by: "Remember, as with any use of force, the threat must be prudent in the use of this alternative control device." According to the policy, an officer may taser a subject once that subject fails to respond to verbal commands so long as the "threat [is] prudent in the use of [the taser]." Contrary to Milpitas' assertion, no existing constitutional doctrine authorizes this behavior in all situations.
 
 
 15
 Milpitas also challenges the evidentiary basis for the jury's finding that the taser policy was invalid. In drafting the policy, Milpitas had used the taser policy of the city of Los Angeles. The central language of each is identical. However, the Los Angeles policy states that the taser is for use against "violent or potentially violent suspects." Milpitas' policy contains no such limitation. Moreover, following the descriptions of the situations in which use of the taser is justified, the Los Angeles policy provides clear limitations on its usage. Instead of this, the Milpitas policy merely alerts the officer to the "prudence" of the threat. The broad permissive language of the Milpitas policy, combined with the fact that it does not require officers to holster their tasers, makes it reasonably likely that Milpitas officers will resort to their tasers immediately after verbalization fails. Milpitas' insistence that its taser policy could not be found invalid is unpersuasive.
 
 2. Failure to Train
 
 16
 Milpitas next challenges the legal basis for the McKenzies' second theory of § 1983 liability: the "failure to train" theory. Under this theory, the McKenzies were required to show that Milpitas' taser training procedures were inadequate, and that the inadequacy was due to deliberate indifference on the part of Milpitas toward the constitutional rights of its citizens. City of Canton, 489 U.S. at 387-388. Milpitas argues that this theory must fail in this case because the McKenzies failed to present evidence of any other instances of taser misuse by Milpitas policy or evidence that Milpitas had notice of the misuse. Milpitas argues that such a showing is required by Oklahoma v. Tuttle, 471 U.S. 808 (1985) and by the "deliberate indifference" requirement. Milpitas misapprehends both.
 
 
 17
 In Tuttle, a plurality of the Supreme Court held that a city could not be held liable under § 1983 based solely on the unconstitutional action of a city officer. Id. at 823-24. In this case, independent of the Milpitas police officers' actions, the jury was required to find a city policy and causation. Tuttle is inapposite.
 
 
 18
 Moreover, "deliberate indifference" does not require a showing of multiple instances of constitutional violations. "[M]unicipal liability under § 1983 attaches where--and only where--a deliberate choice to follow a course of action is made from among various alternatives." City of Canton, 489 U.S. at 389 (quoting Pembaur v. Cincinnati, 475 U.S. 469, 483-84 (1986) (plurality)). Choosing a course of action from various alternatives does not imply that city policymakers must first be aware of constitutional violations, if any, that have been committed by its officers. In so arguing, Milpitas is confusing § 1983 "custom" cases with "failure to train" cases.
 
 
 19
 With regard to the evidence supporting the McKenzies' "failure to train" theory, Milpitas makes the unsupported assertion that "the record does not contain evidence sufficient to support the verdict." We find this unpersuasive.
 
 C. Causation
 
 20
 Milpitas claims that the judgment against it cannot stand because the district court "lost sight" of the causation requirement in § 1983 suits. Not surprisingly, Milpitas fails to mention the court's instructions:
 
 
 21
 The McKenzies claim that the ... [taser] policy ... proximately caused them to be deprived of their rights under the Fourth Amendment to the Constitution. The McKenzies can prevail on this claim only if they prove by a preponderance of the evidence that the city of Milpitas' ... policy regarding the use of tasers authorized its officers to use tasers in an unreasonable manner.... [I]f you find that the officers on the scene used tasers on [the McKenzies] in an unconstitutional manner that finding is not enough by itself [to find Milpitas liable].
 
 
 22
 Milpitas' argument is unfounded.
 
 
 23
 Next, Milpitas argues that even under the McKenzie version of the tasering incident, the taser policy could not have caused the incident. That is, according to the McKenzie version, the officers were acting outside of the taser policy. This argument is contradicted by the record. The McKenzies do not deny that Cecil came running from the house toward his mother and the police officers on the sidewalk. Nor do they deny that Lucille ran toward her fallen son and Officer Ferguson after Cecil was tasered. Nor do they contest Milpitas' assertion that the officers issued verbal commands for the McKenzies to halt. Use of the taser after a subject fails to stop on a verbal command is plainly authorized by the language of the policy. Causation cannot be ruled out as a matter of law.
 
 
 24
 Finally, Milpitas offers no support for its challenge to the evidentiary basis for the causation finding.
 
 II. Evidentiary Rulings
 
 25
 Milpitas argues that the trial court made a number incorrect evidentiary rulings which require reversal. We have examined the rulings and find none that would justify reversal.
 
 A. The McKenzie Police Expert
 
 26
 Milpitas first contends that the district court erred by allowing Frank Saunders, the McKenzies' police expert, to give medical opinions to the jury. Specifically, Milpitas complains that Saunders was allowed to testify that the taser is potentially lethal; that the effects of the taser on subjects with heart conditions "remains unknown"; and that documents he had reviewed indicated that the taser could have adverse effects on the human body. As a police expert, Saunders was permitted to render opinions based on his police training and experience and could reasonably be expected to know something of the effects upon subjects of a weapon used by police. Moreover, the government report upon which Milpitas relied in introducing the taser to its police force states: "[The safety of the taser] cannot be guaranteed. There is no weapon, technique or procedure for subduing ... that does not involve some risk of injury to healthy persons or of death especially if the individual has a heart ailment." Milpitas has not shown that the trial court abused its discretion by admitting the testimony of Frank Saunders or that the admission was clearly erroneous. United States v. Tsinnijinnie, 601 F.2d 1035, 1040 (9th Cir.1979).
 
 B. The Post-Taser Battery
 
 27
 Milpitas next argues that it was error for the trial court to allow Lucille to testify that, after she was tasered, the Milpitas police officers kicked and punched her and pulled her hair. Milpitas argues that this evidence was irrelevant to whether the tasering of the McKenzies was reasonable. This, of course, is correct. However, the trial court made clear that the evidence would be introduced only for the purpose of resolving the factual dispute about what happened, and not to determine reasonableness.
 
 
 28
 In this case, the two sides presented the jury with completely opposite versions of the tasering incident. Milpitas insisted that its officers did not taser non-threatening subjects. The McKenzies claimed that the Milpitas officers had tasered them even though they had presented no objective threat to the safety of the officers. Evidence showing that Milpitas officers beat Lucille McKenzie immediately after tasering her while she lay on the ground and posed no threat tends to prove that the officers did in fact taser the McKenzies while they had posed no substantial threat. Because the evidence was introduced to resolve the factual dispute over what had happened, and not to determine the reasonableness of the officers' actions, Graham, 490 U.S. at 386, upon which Milpitas relies, is inapposite.
 
 
 29
 Milpitas argues only that evidence of the beating had no probative value--not that the danger of unfair prejudice substantially outweighed its probative value. Fed.R.Evid 403. Because the evidence did have probative value, we find no error.
 
 C. Prior Domestic Violence
 
 30
 Third, Milpitas argues that the district court erred by excluding evidence of domestic disputes which had occurred at the McKenzie home on days other than the day of the tasering incident. Milpitas argues that such evidence would have cast doubt on Lucille McKenzie's "self-description as a loving mother." Presumably, this would tend to prove that, after Cecil was tasered, Lucille was not really concerned about him but rather was chasing after Officer Ferguson who was handcuffing Cecil.
 
 
 31
 The district court excluded the evidence of prior domestic disputes because none of the officers present at the tasering incident had known of the prior disputes. Thus, the evidence was completely irrelevant to the central question bearing on the constitutional issue--whether the officers had acted reasonably on that occasion. Moreover, uncontroverted evidence showed that Lucille had cried "[they've] shot my baby" while running toward the fallen Cecil, diminishing the probative value of the prior domestic dispute evidence. Finally, while it excluded evidence of prior disputes, the district court allowed Milpitas to present all the evidence of the domestic dispute which had occurred on the day of the tasering incident--including facts which the officers had been unaware of at the time of the incident. Milpitas has offered nothing to demonstrate that the district court abused its discretion in excluding the evidence. Palmerin v. City of Riverside, 794 F.2d 1409, 1411 (9th Cir.1986).
 
 
 32
 D. Milpitas' Motion to Directly Examine its Expert Twice
 
 
 33
 Milpitas claims that the district court refused to allow its police expert, Don Cameron, to render an opinion on the reasonableness of the officers' actions with regard to the McKenzie tasering incident. In so arguing, Milpitas misrepresents the record. After Milpitas had completed its direct examination of Mr. Cameron, the McKenzies chose not to cross-examine Mr. Cameron. The trial court denied Milpitas' motion to reopen its direct examination. Milpitas' attempt to twist the record on this point reflects no credit on the authors of its brief, and calls for sanctions.
 
 E. The "Cowboy" Remark
 
 34
 Finally, Milpitas argues that the district court's inadvertent reference to Officer Comfort as "the cowboy" prejudiced Milpitas. Milpitas has not requested any relief for this incident nor has it cited a legal basis for granting such relief. Indeed, few trial decisions could stand if reversal was mandated every time a team of appellate lawyers, in combing a trial transcript in excess of one thousand pages, produced a single inadvertent and ambiguous comment. Reliance on this kind of argument in an appeal tends to erode the credibility of the entire brief.
 
 III. The Amount of Damages
 
 35
 For its final argument on the merits, Milpitas claims that the district court erred in refusing to grant a new trial on damages. Milpitas argues that the jury's awards to Lucille and Cecil McKenzie were clearly unsupported by the evidence. A district court must uphold a jury's finding of damages unless the amount is "grossly excessive or monstrous," clearly not supported by the evidence, or "only based on speculation and guesswork." Handguards, Inc. v. Ethicon Inc., 743 F.2d 1282, 1297 (9th Cir.1984) cert. denied, 469 U.S. 1190 (1985). A district court's decision whether to uphold a jury's finding of damages is reviewed for abuse of discretion. Kotz v. Bache Halsey Stuart, Inc., 685 F.2d 1204, 1208 (9th Cir.1982). Milpitas cannot meet this standard.
 
 
 36
 Milpitas argues that no evidence showed that Lucille McKenzie's emotional trauma resulted from being tasered rather from other events which occurred on the same day. At trial, the jury was admonished that it could only award damages for injuries "proximately caused by having been tasered by officers of the Milpitas Police Department." Testimony before the jury showed that Lucille had believed that Cecil had been shot with a revolver and that her own tasering had caused her extreme pain, and anguish that she was powerless to go to her son's aid.
 
 
 37
 Milpitas also complains that the jury's award to Cecil was based solely on its belief that Cecil had been knocked unconscious during the tasering incident. Milpitas characterizes the evidence that Cecil was rendered unconscious as "specious at best." In making this argument, Milpitas is asking this court to overrule the jury on witness credibility. This is not our function.
 
 IV. Bias
 
 38
 Finally, Milpitas argues that the district judge was personally biased against Milpitas. Specifically, Milpitas argues that, under 28 U.S.C. §§ 455(a) and 455(b)(1) (1988), this court should grant Milpitas a new trial. After the conclusion of the McKenzie case, the trial judge made extrajudicial statements in an unrelated case that tended to show that the judge had a hostile reaction to law enforcement activity in seeking his removal from the bench.
 
 
 39
 For determining whether section 455 requires a new trial, "the test under either subsection (a) or (b) is the same, namely, whether or not given all the facts of the case there are reasonable grounds for finding that the judge could not try the case fairly, either because of the appearance or the fact of bias or prejudice." United States v. Conforte, 624 F.2d 869, 881 (9th Cir.), cert. denied, 449 U.S. 1012 (1980). Milpitas concedes (as it must in order to avoid default for untimeliness) that no facts existed prior to the McKenzie trial which would have required recusal of the judge. This concession is fatal to Milpitas' claim of disqualification as a matter of law.
 
 V. Conclusion
 
 40
 The appellees are entitled to costs and attorneys' fees in this court upon submission of the appropriate claim.
 
 
 41
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3